JANE SHARON

*vs.*

GEORGE WOOLDRICK.

Throughout the year 1857, the premises now comprising lot seven (7), section twenty-two (22) in township number one hundred and eleven (111) north, of range thirty-two (32) west, according to the plat of the survey by the government of the United States, were embraced in an Indian reservation, and were not subject to pre-emption or private sale.

Scrip issued under the act of congress entitled "An act to authorize the president of the United States to cause to be surveyed the tract of land in the territory of Minnesota belonging to the half-breeds or mixed bloods of the Dakota or Sioux nation of Indians, and for other purposes," approved July 17, 1854, could not be located upon said premises during said year, and a location thereof upon the same during said year, and a patent issued upon such location are void.

The mere fact that a pre-emptor obtained from a stranger the money with which to pay for the pre-empted land, if it was not done under any contract or agreement of any kind prohibited by the pre-emption law, would not tend to invalidate the pre-emption; and if, having received such money without any such contract, after perfecting his pre-emption and receiving his pre-emption certificate the pre-emptor desired to sell the land to such stranger, or any other person, he could do so.

From the facts that a pre-emptor obtained money from a stranger to pay for his land, and after perfecting his pre-emption and obtaining his pre-emption certificate on the same day sold the land to such stranger, the court will not infer the existence of a contract of purchase inhibited by the pre-emption law.

Where a person is in possession of land under a void title, and another having a valid title thereto peaceably enters and takes possession, the latter is not a trespasser.

Sharon v. Wooldrick.

Action of trespass brought in the district court for Brown county, to recover damages for the alleged unlawful entry upon, and eviction of the plaintiff from, and cutting and removing timber from certain lands of which it is alleged in the complaint, that plaintiff is seized in fee.  Issue was joined, and the cause tried by the court without a jury, and judgment ordered for defendant.  A motion for a new trial was made and denied, and plaintiff appeals to this court.

By a stipulation of the attorneys for the respective parties, the case is submitted to this court upon the following findings of the court below, to-wit:

" The plaintiff claims by virtue of a patent offered in proof of the premises in dispute, dated July 19th, 1860, and claims seizin in fee in land described.  That this patent was issued upon Sioux half breed scrip No. 403 ' I ' to Jane La Fromboise whose present name is Sharon, (the plaintiff,) located Henderson Land Office, July, 1857, on premises in question.  That the patent was recorded July 21, 1864, in Brown county.  That the land embraced in entry and patent was 160 acres, the premises in dispute being divided from the balance by the Minnesota River.  That the patent has never been surrendered, scrip location cancelled, nor scrip returned to scripee. That two weeks before trial of this action the register of the land office notified the husband of plaintiff to surrender the patent.  That the premises in question at the time of location were embraced in the Indian treaties, but were not surveyed as Indian reservation by any actual survey, but were afterwards found to be upon the Sioux reservation.  That the plaintiff and her family lived upon a part of the land covered by the entry over twenty years.  That on the 28th of July, 1866, William Mock entered the land in question by pre-emption, reservation being vacated.  No patent has been issued on this entry.  That Wooldrick furnished the money to Mock

and purchased land in question of Mock, and took a deed on the day of pre-emption for the land, and that defendant has ever since occupied the same. That the value of timber, wood, &c., cut by defendant is one hundred and forty-one dollars."

E. St. Julien Cox, for Appellant.

Lampreys, for Respondent.

*By the Court.*—McMillan, J.—The treaty of Mendota of August 5th, 1851, as originally made between the United States government and Med-ay-wa-kaw-toan and Wah-pay-koo-tay bands of Dakota or Sioux Indians, and submitted to the senate, contained a section reserving to the Indians a tract of country of the average width of ten miles on either side of the Minnesota River, and bounded on the west by the Tchay-tam-bay and Yellow Medicine rivers, and on the east by the Little Rock River, and a line running due south from its mouth to the Waraju River.

The senate of the United States amended the treaty by striking out the section providing for the reservation aforesaid, and by adding a stipulation to pay said bands of Indians at the rate of ten cents per acre for the lands included in said reservation provided for in the section stricken out, and by adding the further stipulation that the president be authorized, with the assent of the Indians after their assent to the amended treaty, as soon as may be convenient, " to cause to be set apart by appropriate landmarks and boundaries, such tracts of country without the limits of the cession made by the first article of the treaty as may be satisfactory for their future home: *Provided*, that the president may, by the consent of these Indians, vary the conditions aforesaid if deemed expedient."

Sharon v. Wooldrick.

The Indians " confiding in the justice, liberality and humani-
ty of the president and the congress of the United States,
that such tracts of country will be set apart for our (their)
future occupancy and home as will be to us (them) acceptable
and satisfactory," assent to the treaty as amended by the
senate.    10 *U. S. Statutes at Large*, 954–959.

The president so far varied the condition of said senate
amendment as to permit said bands to locate for the time be-
ing upon the tract originally reserved by said bands for a
home, and no tract of country without the limits of the ces-
sion made in said treaty has ever been provided for or offered
to said bands.

And by the act making appropriation for the current and
contingent expenses of the Indian department, and for fulfil-
ing treaty stipulations with various Indian tribes, approved
July 31, 1854, the president was authorized to confirm to the
Sioux of Minnesota, forever, the reserve on the Minnesota
River at that time occupied by them upon such conditions as
he may deem just.    *Treaty June* 19, 1858, *art.* 2, 12 *U. S. Stat-
utes at Large*, 1038; 10 *Ib. p.* 326.

The president never having directly confirmed said reserva-
tion to the Indians, a treaty was entered into between the
United States and these, with other bands of Indians, on the
19th of June, 1858, by the second article of which, after
reciting, *inter alia*, the foregoing facts, it is stipulated that the
question shall be submitted to the senate for decision whether
the Indians have title to the reservation occupied by them;
and upon the submission of the question under the treaty the
senate decided, " that said Indians possessed a just and valid
right and title to said reservation."    *Treaty June* 19, 1858, *art.*
2, 12 *U. S. Statutes at Large, p.* 1032; *Resolution of the Senate
of the United States,* 12 *Ib.* 1042.

By the terms of the treaty of Mendota it is expressly pro-

vided, as we have seen, that the president, with the consent of the Indians, might vary the conditions of the amendment made by the senate if deemed expedient. Under this provision it was clearly competent for the president to vary the amended treaty so as to permit these bands of Indians to occupy the tract described in the treaty as first submitted, no other reservation having been provided for them.

The fact of title to land in the government, subject to the exclusive right of the Indians to occupy the same as a home or reservation, is not at all inconsistent; indeed that is ordinarily the case when an Indian reservation exists by virtue of a treaty, and would have been the case if this treaty had been ratified as submitted.

But if there were doubts about the question upon the treaty itself, in view of the construction given it by the senate in its decision upon the question submitted to it by the treaty of 1858, such doubts would seem to be resolved in favor of the existence of the power exercised by the president in this instance.

We are, therefore, to take judicial notice that the tract of country from the Little Rock River and a line running due south from its mouth to the Waraju River, to the Tchay-tambay and Yellow Medicine rivers of the average width of ten miles on either side of the Minnesota River, was an Indian reservation throughout the year 1857.

By the stipulation made by the parties in the case, it is settled that the premises in question at the time of the location were embraced in the Indian treaties, but were not surveyed as an Indian reservation by any actual survey, but were afterwards found to be upon the Sioux reservation.

The scrip located upon the premises by the plaintiff was issued under the act of congress entitled "An act to authorize the president of the United States to cause to be surveyed the

tract of land in the territory of Minnesota, belonging to the half-breeds or mixed-bloods of the Dakota or Sioux nation of Indians, and for other purposes," approved July 17, 1854. (10 *U. S. Statutes at Large*, 304.)

It could be located upon any unoccupied lands subject to pre-emption or private sale, or upon any unsurveyed lands not reserved by government, &c.

The premises in question were reserved by the government, and were not subject to pre-emption or private sale. The scrip, therefore, could not be located upon them ; the location of the scrip upon the land, and the patent issued thereupon were void, and vested no title in the plaintiff.

By act of congress approved March 3d, 1863, the president was directed to provide a tract of land outside of the limits of any state or territory for these Indians, with others, and the lands then occupied by them, including the *locus in quo*, were to be surveyed and opened to pre-emption, entry and settlement. By the stipulation between the parties, above referred to, and by which we are concluded, it is stated, " that on the 28th of July, 1866, William Mock entered the land in question by pre-emption, reservation being vacated. No patent has been issued on this entry. That Wooldrick furnished the money to Mock and purchased land in question of Mock, and took a deed on the day of pre-emption for the land, and that defendant has ever since occupied the same."

The presumption is that these facts were established by competent evidence ; that the entry of the land by Mock was proved by the certificate of the proper land officer of the United States, which by our statute is *prima facie* evidence that the title to the land was in Mock at the time of the conveyance. ( *Walsh vs. Kattenberg*, 8 *Minn.* 132.)

The mere fact that Mock obtained from Wooldrick the money with which to pay for the pre-empted land, if it was not

done under any contract or agreement of any kind by which the title he might acquire from the government should enure in whole or in part to any person except himself, would not tend to invalidate the pre-emption. And if, having received such money without any such contract, after perfecting his pre-emption and receiving his certificate of purchase from the proper officer, he desired to sell the land to Wooldrick or any other person, he could do so. *Camp vs. Smith*, 2 *Minn.* 155.

If the conveyance of the land by Mock to Wooldrick was made under and in pursuance of an ante-pre-emption contract of purchase, it was a fraud upon the government, and Mock must have sworn falsely.

We think it is a reasonable construction of the language of the stipulation, if not the only reasonable one, that the purchase, that is, the entire negotiation for the purchase of the land, as well as the execution of the deed, was subsequent to the time Mock obtained his certificate of pre-emption.

This being so, we cannot infer the existence of a contract of purchase inhibited by the pre-emption law from the fact that Wooldrick furnished Mock the money to pay for the land, and after Mock had obtained his certificate purchased the land from him, and took a deed therefor on the same day, for that would be to impute both fraud and crime to Mock, upon a state of facts, at least doubtful. Mock's pre-emption, and the conveyance by him to Wooldrick were, therefore, valid; and by the conveyance the title to the land vested in Wooldrick.

The plaintiff's location and patent being void, we are inclined to doubt whether it appears that she had possession of *that portion* of the premises described in her patent which constitutes the *locus in quo;* but even conceding her possession at the time, her title being void, and Wooldrick having entered peaceably under a valid title, was not a trespasser.

The defendant, therefore, was entitled to a finding in his favor.

The order denying a new trial is affirmed.